## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| **WILLIAM EMMONS,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **C.A. NO. _____** |
| | § | |
| **MATTHEW FLEEGER, C. REED** | § | |
| **CAGLE, DUSTIN COLLINS and** | § | |
| **JON MCGINNIS,** | § | **JURY DEMANDED** |
| **Defendants.** | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT

William Emmons, hereinafter referred to as Plaintiff, brings this civil action complaining of Matthew Fleeger ("Fleeger"), C. Reed Cagle ("Cagle"), Dustin Collins ("Collins") and Jon McGinnis ("McGinnis"), collectively referred to herein as "Defendants," and for cause of action would show the following:

### JURISDICTION AND VENUE

1.      This civil action is brought, in part, pursuant to the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 and 18 U.S.C. § 1964.

2.      This court has pendant or ancillary jurisdiction over the remaining state law cause of action for common law fraud, as the same arises from the same transactions, occurrences and set of operative facts as the claims arising under 18 U.S.C. §§ 1962 and 1964.

1

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## PARTIES

4.      Plaintiff has, at all times relevant to this civil action, been a citizen of the state of Texas, residing in the Southern District of Texas, Galveston Division.

5.      Fleeger, on information and belief, is citizen of the state of Texas, residing in the Northern District of Texas.

6.      Cagle, on information and belief, is a citizen of the state of Colorado, residing in the District of Colorado.

7.      Collins, on information and belief, is a citizen of the state of Texas and resides in the Northern District of Texas.

8.      McGinnis, on information and belief, is a citizen of the state of Texas and resides in the Northern District of Texas.

## BACKGROUND FACTS

9.      Plaintiff, at all times relevant to this civil action, has resided in Dickinson, Galveston County, Texas.

10.     Plaintiff, at the time of his first contact from Defendants, was in a second career as an over-the-road truck driver.

11.     In the late summer of 2009, Plaintiff was contacted by telephone by an individual who introduced himself as Mr. Darrin Hunter, a sales representative with an

entity by the name of Gulf Coast Western, L.L.C. ("GCW"). Prior to this telephone call from Mr. Hunter, Plaintiff had never heard of GCW.

12. The telephone call described in paragraph 11 was placed to Plaintiff at Plaintiff's home, and Plaintiff was at home when he received this call. During this telephone call, Mr. Hunter presented Plaintiff with a proposal for participation in an oil and gas exploration venture. Prior to this contact, Plaintiff had never engaged in any type of oil and gas venture, by investment or otherwise, and had never been a party to any type of business partnership.

13. Plaintiff's sole experience with investment was through retirement accounts held at TD Ameritrade. Like most Americans, Plaintiff experienced substantial losses in the value of his retirement accounts as a result of the financial crisis of 2008 and its after-effects. As such, and as Plaintiff explained to Mr. Hunter during the conversation described above, Plaintiff was not looking to engage in any further investments at that time. Mr. Hunter ended the conversation by asking Plaintiff if he could send Plaintiff some information regarding GCW. Plaintiff agreed, and materials were sent to Plaintiff's home with an accompanying cover letter signed by Fleeger.

14. The materials that Plaintiff received described an opportunity to purchase a partnership interest in an oil and gas exploration venture involving 20 prospective wells in far west Texas, and two wells in Alabama. The project involved the formation of a separate joint venture for each well to be drilled. The written information for the drilling prospects described a "proprietary" process known as SAM, which stood for Seismic Attribute Methodology. The written information provided to Plaintiff further described

3

the West Texas property (located in Gaines County, Texas, and referred to generally as "Jones Ranch") with each well containing estimated reserves of 1.1 million barrels of oil, and that the subject wells were in the vicinity of other previously developed fields from which over 108.6 million barrels of oil had been produced over a 45 year period.

15.     The information delivered to Plaintiff discussed a methodology employed by GCW for locating wells to drill, the Seismic Attribute Methodology ("SAM") process discussed above. As stated in the written information provided to Plaintiff:

> "[T]he geophysicist who developed the Seismic Attribute Methodology (SAM) program has successfully identified this attribute in 100% of the lower Devonian wells in which he has been involved.   Of those identified utilizing this methodology, approximately 70% of the wells are in production, 20% of the wells are in the completion phase (deemed productive based on log and test results) and 10% were not commercially productive due to faulting issues."

**Jones Ranch No. 1**

16.     Shortly after receiving the materials sent to him by GCW, Plaintiff received a telephone call from Collins, who identified himself as a vice president of GCW.  Plaintiff reiterated his reticence in making any speculative investments at that time due to losses he had incurred in the 2008 financial crisis, and his lack of experience in oil and gas matters.   In response, Collins told Plaintiff that GCW was a highly experienced and successful exploration and production company, with substantial holdings in the Jones Ranch property, and that the property had been historically productive, producing in the past 10's of millions of barrels of oil.  Expanding on the

4

glowing promises made in the promotional literature sent to Plaintiff, Collins assured Plaintiff that the SAM methodology had been proven to be 88% effective in predicting productive new oil and gas wells. Collins specifically told Plaintiff that SAM ensured that there was no possibility of two consecutive failed wells. In response to inquiries from Plaintiff, Collins stated that SAM was a proprietary program and that GCW was not allowed to divulge any of its specifics. However, Collins assured Plaintiff, it had worked when used by GCW.

17.    Collins further told Plaintiff that 7 out of 8 wells in Jones Ranch that had been identified utilizing the SAM methodology were producing wells. Plaintiff was led to believe by Collins that these other wells were projects in which GCW was participating. Collins explained to Plaintiff that of the 20 Jones Ranch wells to be drilled in this project, Jones Ranch No. 1, was almost a sure thing, and that once the well came in, as Mr. Collins said it would, then purchasers would be lining up buy interests in Jones Ranch ventures. However, as a special part of the offer being made to Plaintiff, by purchasing an interest in the Jones Ranch No. 1 well, Plaintiff would have the first right to purchase ownership interests in all future drilling projects. The price: $85,000.00 for a one unit interest, plus completion costs of $34,000.00 if the drilling was successful.

18.    Relying on Collins' glowing recommendations and representations, Plaintiff stated that he was interested in purchasing a ½ unit interest in Jones Ranch No. 1. Collins talked Plaintiff into buying a full interest by telling him again about the SAM testing results, the 88% chance of the well hitting, that Jones Ranch No. 1 would be the

first to be drilled, because it was the best well, and that the money he would make off of Jones Ranch No. 1 would ensure his and his children's financial future.

19.    Plaintiff agreed, and a second package was then sent to Plaintiff at his home by Collins, which included a Confidential Information Memorandum regarding Jones Ranch No. 1, a questionnaire regarding Plaintiff's experience and assets, and signature pages for the Joint Venture Agreement.  Collins telephoned Plaintiff to make certain that these documents were being filled out and returned, with a check for $85,000.00.  Collins instructed Plaintiff how to fill out the questionnaire so that Plaintiff would be "qualified" to join the Joint Venture.  In many instances, Collins instructed Plaintiff to include information regarding Plaintiff's assets and investment and business experience that was inaccurate, which had the effect of inflating Plaintiff's apparent sophistication and expertise with investment matters, and overstating Plaintiff's financial strength.  Plaintiff informed Collins that much of the information that Collins instructed the Plaintiff to enter was inaccurate.  Collins told Plaintiff not to be concerned, that the paperwork was a formality.

20.    Jones Ranch was structured as a Joint Venture. Included in the package sent to Plaintiff was a description of the proposed Joint Venture, including its two executive officers, Defendant Cagle and Defendant Fleeger.  The extensive experience of each was highly touted.  Cagle and Fleeger are listed in the Jones Ranch No. 1 Joint Venture Confidential Information Memorandum as the "Co-Chief Executive Officers" of GCW.

21.    Based on these representations, Plaintiff executed an execution page and questionnaire for the acquisition of a 1-unit interest in the Gulf Coast Western Jones Ranch No. 1 Joint Venture, on August 5, 2009. Initially, a check for $85,000.00 from Plaintiff's personal account was sent to Gulf Coast Western along with the execution page and questionnaire. However, Plaintiff was uncertain still, and soon after sending the check instructed Collins to return said check. A call was placed by Collins to Plaintiff, during which Collins reiterated his assurances to Plaintiff that Jones Ranch No. 1 was virtually a sure thing to hit, and that the money would receive from that well alone would be enough to fund Plaintiff's retirement, with plenty of money to invest in the other wells as part of the Jones Ranch and Alabama projects.

22.    Collins further emphasized that Plaintiff was morally bound to honor his commitments. Collins said that as a man, Plaintiff needed to keep his word, and complete the purchase of his interest in Jones Ranch No. 1. Plaintiff acquiesced, this time, funding the $85,000.00 purchase price through his retirement accounts at TD Ameritrade. The transaction was closed in late September of 2009.

**Jones Ranch No. 2.**

23.    Soon after the payment from TD Ameritrade was received from GCW, Plaintiff received a call from Collins, who now informed Plaintiff that the Jones Ranch program had changed, and that he was now obligated to purchase not only the interest in Jones Ranch No. 1, but also an interest in the second well scheduled to be drilled, Jones Ranch No 2. This had never been disclosed to or discussed with Plaintiff, and Plaintiff was disturbed. Plaintiff told Collins that he had never heard of such a requirement, that

7

he did not agree to such a requirement. In addition, Collins told Plaintiff that Jones Ranch 2 was going to be drilled first, not Jones Ranch No. 1, which was the opposite of what Collins had told Plaintiff to induce Plaintiff into buying into Jones Ranch No. 1.

**Opelousas 1A.**

24.     In October of 2009, Collins contacted Plaintiff by telephone, stated that he regretted the prior misunderstanding concerning Jones Ranch No. 1, and to show his good faith, offered Plaintiff an opportunity to purchase an interest in a joint venture drilling for oil in Louisiana, known as the Opelousas 1A Joint Venture ("Opelousas 1A"). The prospects for this well, according to Collins, were excellent, testing showed outstanding results, and it was ready to produce. He had a ½ unit interest left, and he wanted to sell that to Plaintiff. He once again assured Plaintiff that the well testing had excellent results, and that this would make his future. Plaintiff agreed to acquire the ½ unit interest for $50,000.00.

25.     As with Jones Ranch No. 1, paperwork was submitted to Plaintiff to fill out, which was done under the direction and supervision of Collins, over the telephone. Plaintiff gave instructions to execute the purchase through his retirement accounts, as he had with the Jones Ranch No. 1 purchase. After approximately one week, Collins called Plaintiff and told Plaintiff that if the money was not going to be paid immediately, Plaintiff would lose out on the opportunity to buy into Opelousas 1A. Plaintiff told Collins that it took time for TD Ameritrade to complete the purchase process within the retirement account. Collins stressed to Plaintiff that Opelousas 1A was a great prospect,

ready to begin producing, but that if he did not receive payment from Plaintiff right away, he would have to sell the ½ interest to someone else.

26.     Collins also informed Plaintiff that there would be no adverse tax consequences from Plaintiff's withdrawal of the $50,000.00 from his retirement accounts, as opposed to having the purchase made within his retirement account, as all costs of exploration and production would be a tax deduction.     Based on all of these representations, Plaintiff withdrew the purchase money from his retirement accounts, and made the payment to GCW, purchasing Opelousas 1A.

**Acreage JV**

27.     Contrary to the representations made to Plaintiff that Jones Ranch No. 1 would be the first to be drilled, Plaintiff discovered that in fact Jones Ranch No. 2, the well that Plaintiff had not purchased, was the first to be drilled.     In October or early November of 2009, Collins contacted Plaintiff, and informed Plaintiff that the Jones Ranch No. 2 had been successfully tested.     Collins reminded Plaintiff of Plaintiff's decision not to buy an interest in Jones Ranch No. 2, suggesting that such was a very bad decision on Plaintiff's part.

28.     Collins had more bad news.     Opelousas 1A, according to Collins, was a bad well, and that Plaintiff was going to lose his money on that one.     However, Collins was prepared to make Plaintiff another offer.     He informed Plaintiff that the initial plan for 20 Jones Ranch and 2 Alabama wells had (with the exception of Jones Ranch No. 1) been incorporated into a venture known as the Acreage Joint Venture.     The Acreage Joint

Venture included the Jones Ranch No. 2 well. Plaintiff could buy into Jones Ranch No. 2, a proven quantity, by buying into the Acreage JV.

29.    The cost to purchase a unit of Acreage JV was $500,000.00. Collins stated that in light of the loss Plaintiff would sustain in Opelousas 1A, he was prepared to offer Plaintiff a ¼ interest in the Acreage JV. The cost of the ¼ interest was $125,000.00. To make the purchase more palatable, Collins offered to move Plaintiff's $50,000.00 purchase of Opelousas 1A into Acreage JV, leaving only $75,000.00 for Plaintiff to pay to complete the purchase. In other words, for a ¼ interest in the Acreage JV, Plaintiff would trade his interest in Opelousas 1A, and pay on top of that $50,000.00. Facing a total loss of his purchase price for Opelousas 1A, and relying on Collins' representations of the successful testing of Jones Ranch No. 2, Plaintiff agreed. Once again, paperwork was sent to Plaintiff, and Collins instructed Plaintiff on how to fill it out.

30.    In January of 2010 Fleeger conducted a "partners' meeting" of Jones Ranch No. 1 Joint Venture via teleconference to discuss test results on the well being drilled and the need for completion funds. Plaintiff was sent a notice of this meeting to his home, and listened in to the teleconference meeting from his home. During the meeting, Fleeger repeated, what Collins had reported concerning the success of the Jones Ranch No. 2 well, as an assurance that the Jones Ranch No. 1 well would be a success. Fleeger specifically stated that test results confirmed the presence of oil deposits in reservoirs at five different layers for both the Jones Ranch No. 1 and Jones Ranch No. 2 wells, which he said indicated a large oil field. All that was needed, said Fleeger, was

additional money for completion. Based on these representations, Plaintiff paid an additional $34,000.00 in completion costs for the Jones Ranch No. 1 well.

**Opelousas 2.**

31.    In May of 2010, Plaintiff was contacted by Defendant McGinnis, who identified himself as the successor vice president to Collins. McGinnis began his conversation with Plaintiff by stating that he understood that Plaintiff had voiced serious concerns regarding his dealings with Collins. McGinnis expressed sympathy with Plaintiff's experience, going so far as to admit to Plaintiff that Collins had "screwed" Plaintiff by talking Plaintiff into trading Plaintiff's interest in Opelousas 1A. As it turned out, Opelousas 1A was not a bust, but was quite successful, producing 652 barrels of oil per day and 3,183 cubit feet of natural gas per day.

32.    McGinnis told Plaintiff that GCW does what it says it will do. According to McGinnis, the Acreage JV was to be expanded through properties in New Mexico by GCW due to unanticipated findings of natural gas at another GCW drilling project, Jones Ranch No. 3. McGinnis also represented to Plaintiff that Jones Ranch 1 and 2 were at the time on hold, awaiting a permit from the Texas Railroad Commission for water injection. McGinnis assured Plaintiff that once work started up on Jones Ranch 1 and 2, there would be a good payout, as these were both excellent wells.

33.    After telling Plaintiff what a great success Opelousas 1A turned out to be, McGinnis then told Plaintiff that he had available for purchase a ½ interest in another Louisiana well, near the Opelousas 1A field, named Opelousas II. The purchase price for this Opelousas II well was represented to be $43,000.00. Plaintiff told McGinnis about

11

his strained financial status. McGinnis stressed what a good opportunity Opelousas II presented, telling Plaintiff that the well would certainly pay off for Plaintiff. Based on these assurances and representations made by McGinnis, Plaintiff agreed. As with the Opelousas 1A, Acreage JV and Jones Ranch No. 1 joint ventures, Plaintiff received a package containing promotional brochures, Confidential Information Memoranda, and questionnaires and execution pages essentially identical in content. As before, Plaintiff was instructed on how to fill out the paperwork. Plaintiff had to borrow the funds to pay the $43,000.00 for Opelousas II.

34.     Soon after Plaintiff completed his purchase of Opelousas II, McGinnis telephoned Plaintiff and told Plaintiff that the drilling plans for Opelousas II had changed, and that Opelousas II would now be drilled using horizontal drilling methods. Opelousas II had been marketed and described to Plaintiff as a vertical drilling project, like Opelousas 1A, with set initial completion costs of $27,000.00. The additional completion costs that Plaintiff was now expected to pay essentially doubled his completion obligation. McGinnis knew of Plaintiff's strained financial condition, and that he had to borrow funds to pay the initial $43,000.00. The effect of this increase was to double Plaintiff's cost in Opelousas II. Plaintiff complained that (a) that was not what he had agreed to and (b) he was broke, and could not pay any more. McGinnis stated that Plaintiff's interest in Opelousas II would be reduced to a ¼ unit.

35.     The sale of Opelousas II took place in June of 2010. The demand for additional drilling costs for Opelousas II was made soon after, during that same summer. It was then that it became known to Plaintiff that none of the representations regarding

12

any of the joint ventures that were made or authored by Defendants proved to be true. The representations regarding a successful drilling rate of 88% proved false. Virtually everything that the Plaintiff was told by Collins and Fleeger with respect to the SAM methodology, particularly its predictive capabilities with respect to locating sites for drilling successful wells, had been false, and McGinnis used a "faux honesty" with regard to Collins' representations to lure Plaintiff into paying even more money through the purchase of Opelousas II, and deflect Plaintiff from taking action with regard to his losses on his other purchases. There was some apparent light at the end of the tunnel when McGinnis called Plaintiff to tell him that Opelousas II had hit, and was producing 550 barrels of oil a day.

36.   In January of 2011, Plaintiff received two telephone calls from Fleeger. Fleeger said that GCW would pay all completion costs on Opelousas II, and pay all sub-operator costs associated with Jones Ranch No. 1. No other terms or requirements were discussed. Based on these representations by Fleeger, and the representations made by McGinnis regarding the production from Opelousas II, Plaintiff agreed. Fleeger indicated he would send paperwork to reflect the agreement.

37.   When the paperwork was sent to Plaintiff for his signature, Plaintiff discovered that the offer made by Mr. Fleeger and accepted by Plaintiff on the telephone was far different from what was contained in the paperwork sent to Plaintiff to sign. Plaintiff did sign the proposed paperwork.

38.   A few months after Fleeger's attempt to reduce Plaintiff's interest in the Acreage JV, Plaintiff began receiving payments (albeit small ones) from the Acreage JV

13

drilling operations. These payments were received after Fleeger and Cagle orchestrated a purchase by the Acreage JV of certain shallow wells in Oklahoma which provided "cover" for Defendants, to allow them to claim that they had, in fact, drilled successful wells.

39.    Sometime afterward Fleeger's call of January, 2011, Plaintiff was told that the Opelousas II well had been plugged to complete drilling operations; however, when drilling operations started up again, it was discovered that something had gone wrong and the plug could not be removed, effectively killing that investment as well.

40.    Finally, in the spring of 2011, TD Ameritrade contacted GCW to determine the value of Jones Ranch No. 1 JV for tax purposes. TD Ameritrade was informed by Fleeger that Plaintiff's interest in Jones Ranch No. 1 JV had been forfeited.

41.    To date, Plaintiff has paid a total of $287,000.00 to various joint ventures managed directly by Defendants, all based on false and fraudulent representations made by or at the express direction of Defendants. Of the money paid by Plaintiff, a substantial portion was paid to GCW, and through GCW, to Defendants either directly or indirectly.

42.    All of the acts and omissions, false representations and promises described above were part of a plan, scheme or artifice on the part of Cagle and Fleeger, with whom Collins and McGinnis participated knowingly, to dupe money out of Plaintiff or mislead Plaintiff as to the true nature of the projects being drilled and the prospects for recovery. The fraudulent plan, scheme or artifice included projections of success which the Defendants knew to be false, or which the Defendants made with reckless regard to the truth of the matters being asserted by them. Said plan, scheme or artifice was

14

additionally used to fraudulently induce Plaintiff to surrender his interest in the Opelousas IA joint venture, and to attempt to induce Plaintiff to surrender ½ of his interest in the Acreage Joint Venture.

43.    Cagle and Fleeger are the owners, control persons, and beneficiaries of monies received by GCW through the fraudulent schemes and artifices described above. Collins and McGinnis, on information and belief, received a portion of the monies derived from the plan, scheme or artifice implemented by Defendants. Cagle and Fleeger have had a long history of forming and/or participating in the same or similar types of schemes in the past. Cagle and Fleeger are the control persons of GCW, which, as the managing venture of GCW, is in control of each of the Joint Ventures in which the Plaintiff was induced to participate. Defendants, in perpetrating the scheme described above, utilized GCW, a Texas limited liability company, as an enterprise to carry out their fraudulent intent.

44.    As a direct and/or proximate result of the acts and omissions described above, Plaintiff was damaged in his property in the sum of $287,000.00 representing monies paid to GCW, from which Defendants directly benefited. In addition, as a direct and/or proximate result of the fraudulent plan, scheme or artifice perpetrated by Defendants, Plaintiff has suffered from a loss of potential profits from the Opelousas IA joint venture. Finally, Plaintiff, as a consequence of his reliance on representations made to him by Collins and others regarding the tax consequences of the purchases of the oil and gas interests, has suffered tax losses through the withdrawal of monies from his retirement accounts.

45.     In order to seek redress for the injuries he sustained as described above, Plaintiff has hired the attorneys identified below, and has agreed to pay them a reasonable fee.

### COUNT 1 – VIOLATIONS OF 18 U.S.C. § 1961, ET SEQ.

46.     Plaintiff incorporates herein the allegations set forth in paragraphs 1 through 45 above.

47.     Plaintiff would show that Defendants Fleeger, Cagle, McGinnis and Collins, persons within the meaning of RICO, commencing in late September, 2009, acquired the sum of $287,000.00 from the Plaintiff through false and fraudulent promises, representations and pretenses.

48.     The Defendants accomplished this through the false and/or misleading use of the SAM methodology, and efficacy of the test or program results, to lead Plaintiff to believe that each of the wells that the Joint Ventures wholly controlled by Defendants would drill had at least an 88% probability of being successful.

49.     Representations were made regarding the prospects of success on wells which were represented to have already been commenced, which proved to be false, with the intention of inducing Plaintiff to deliver funds to the Defendants' controlled entity, GCW.

50.     Fleeger made representations in November of 2009 and January of 2010 that the Jones Ranch well was almost assuredly a success, when such were known to be false, or made with reckless disregard for the truth of the matters asserted, in an effort to

induce the payment of additional completion costs and purchase of additional GCW managed oil and gas joint ventures.

51.     Defendants induced Plaintiff into surrendering his interest in the Opelousas 1A joint venture through false representations that the Opelousas 1A well was a failure, thus depriving Plaintiff of an opportunity to participate in the profits from that venture.

52.     GCW, the enterprise through which Defendants perpetrated the fraud at issue in this lawsuit, and each of the Joint Ventures into which the Plaintiff was induced to join as a partner, are engaged in and affect interstate commerce.

53.     The $287,000.00 was taken, and the surrender of the Opelousas 1A venture was obtained, through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(b).   As set forth above, in furtherance of defendants' scheme to obtain $287,000.00 from the Plaintiff, and to induce Plaintiff to surrender his soon to be paying interest in the Opelousas 1A venture, defendants utilized the United States wires in violation of 18 U.S.C. § 1343.   These uses of telephone transmissions constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961.

54.     Defendants personally benefitted from the money fraudulently extracted from Plaintiff, and the monies that Plaintiff lost the opportunity to receive from the Opelousas 1A joint venture.

### COUNT 2 – VIOLATIONS OF 18 U.S.C. § 1962(d)

55.     Plaintiff re-alleges paragraphs 1 through 54.

56.    Defendants, in violation of 18 U.S.C. § 1962(d), conspired to violate 18 U.S.C. § 1962(b).

57.    The conspiracy to obtain or attempt to obtain these monies and partnership interest was carried out through a pattern of racketeering activity.  As set forth above, Defendants utilized telephone wires and transmissions to obtain monies from Plaintiff, and induce Plaintiff to "exchange" various partnership interests, in violation of 18 U.S.C. § 1343.

58.    The defendants conspired to obtain money from Plaintiff, and regain partnership interests from Plaintiff, for personal financial gain.

## COUNT 3 – COMMON LAW FRAUD

59.    Plaintiff re-alleges paragraphs 1 through 54.

60.    Representations were made by, or at the behest of, Defendants, which included the likelihood of production of oil in paying quantities, the efficacy of the SAM process or program cited to in each instance in locating successful drilling prospects, the likelihood of successful production of wells that were nearing completion stage, and the viability of certain wells which were being drilled.

61.    The representations described above were false when made to the Plaintiff.

62.    The representations described above were made for the express purpose of (a) inducing Plaintiff to put money into the various joint ventures discussed above and (b) inducing Plaintiff to exchange his interest in the valuable Opelousas 1A Joint Venture for what the Defendants thought to be worthless interest in the Acreage Joint Venture.

63.    Plaintiff, not sophisticated or knowledgeable in oil exploration ventures, reasonably relied upon the representations made by or at the behest of Plaintiffs, all to Plaintiff's harm and damage.

## COUNT 4 – CIVIL CONSPIRACY TO COMMIT COMMON LAW FRAUD

64.    Plaintiff re-alleges paragraphs 1 through 54.

65.    Defendants, in concert and conspiracy between and amongst themselves and others, conspired to defraud Plaintiff.  Representations were made by, or at the behest of, Defendants, or others acting at or on their behest, for the purpose of furthering the object of the conspiracy, which was to obtain by fraudulent means monies from Plaintiff. The scheme included representations as to the likelihood of production of oil in paying quantities, the efficacy of the SAM process or program cited to in each instance in locating successful drilling prospects, the likelihood of successful production of wells that were nearing completion stage, and the viability of certain wells which were being drilled.

66.    The representations described above were false when made to the Plaintiff.

67.    The representations described above were made for the express purpose of (a) inducing Plaintiff to put money into the various joint ventures discussed above and (b) inducing Plaintiff to exchange his interest in the valuable Opelousas 1A Joint Venture for what the Defendants thought to be worthless interest in the Acreage Joint Venture.

19

68.    Plaintiff, not sophisticated or knowledgeable in oil exploration ventures, reasonably relied upon the representations made by or at the behest of Plaintiffs, all to Plaintiff's harm and damage.

### DAMAGES AND PRAYER FOR RELIEF

69.    As a direct and proximate result of the wrongful acts and omissions of the Defendants as alleged above, Plaintiff has sustained a loss of $287,000.00 dollars in direct payments to the joint ventures controlled by the Defendants.

70.    In addition, Plaintiff has been deprived of his interest in the Opelousas 1A venture, which he was fraudulently induced to surrender, which has damaged Plaintiff in an amount to be determined by the trier of fact.

71.    In addition, Plaintiff has suffered tax losses due to the false and misleading tax advice provided by Defendants.

72.    Plaintiff further seeks recovery of three times his actual damages, pursuant to 18 U.S.C. § 1964(c).

73.    Plaintiff further seeks recovery of costs, as well as his reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c).

74.    Plaintiff additionally or alternatively seeks an award of punitive or exemplary damages pursuant to Chapter 42 of the Texas Civil Practice and Remedies Code. In this regard, Plaintiff would show that the acts and omissions of the Defendants were intentional, or undertaken with a gross disregard for the harm that such acts and omissions would have on the Plaintiff. As such, the acts and omissions were intentionally committed, or constituted gross negligence on the part of Defendants.

20

Plaintiff seeks an award from the trier of fact of exemplary damages in a sum to be determined by the trier of fact sufficient to punish the wrongdoers, and deter others who may be similarly inclined from taken such action, subject to any applicable limitations as set forth in Chapter 42, Tex. Civ. Prac. Rem. Code.

75.    Plaintiff accordingly prays that Defendants be cited in terms of law to appear and answer, and that on final trial Plaintiff have judgment against each defendant, jointly and severally, for Plaintiff's actual damages, additional damages under 18 U.S.C. § 1964(c), punitive or exemplary damages under Chapter 42 of the Tex. Civ. Prac. Rem. Code, reasonable attorney's fees, for costs of court, for prejudgment and post judgment interest, and for all other and further relief, at law and in equity, to which Plaintiff may be justly entitled.

## DEMAND FOR TRIAL BY JURY

76.    Plaintiff hereby requests and demands trial by jury on all questions and issues of fact.

August 7, 2013

Daniel Kistler
SBOT # 11540300
Southern District of Texas # 30

**OF COUNSEL:**

**DANIEL KISTLER, ATTORNEY AT LAW**
2617C West Holcombe, No. 421
Houston, Texas 77025
Telephone:  (713) 855-0827
Facsimile:  (866) 352-5124
kistlerattorney@comcast.net

21

James Andersen
SBOT # 01165850
Southern District of Texas # 20144


**JAMES M. ANDERSEN, ATTORNEY AT LAW**
P.O. Box 58554
Webster, Texas  77598-58554
Telephone:  (281) 488-2800
Facsimile:   (281) 480-4851
Jandersen.law@gmail.com